**BEFORE THE UNITED STATES JUDICIAL PANEL
ON MULTIDISTRICT LITIGATION**

| | |
|---|---|
| IN RE NPK FERTILIZER ANTITRUST LITIGATION | MDL No. |

**MEMORANDUM IN SUPPORT OF MOTION TO
TRANSFER RELATED ACTIONS PURSUANT TO 28 U.S.C. § 1407
FOR COORDINATED OR CONSOLIDATED PRETRIAL PROCEEDINGS**

Plaintiff IIHAB Partnership in the matter *IIHAB P'ship v. Nutrien Ltd., et al.*, No. 4:26-cv-00221 (W.D. Mo. Mar. 16, 2026) respectfully submits this memorandum of law in support of its Motion to Transfer Related Actions Pursuant to 28 U.S.C. § 1407 for Coordinated or Consolidated Pretrial Proceedings.

Movant filed a Class Action Complaint in the Western District of Missouri in which it alleges that Defendants Nutrien Ltd. and Nutrien AG Solutions (together, the "Nutrien Defendants"); The Mosaic Co. and Mosaic Fertilizer, LLC (together, the "Mosaic Defendants"); CF Industries Holdings, Inc.; Koch Industries, LLC, Koch AG & Energy Solutions, LLC, Koch Fertilizer Wever, LLC, Koch Agronomics Services, LLC, and Koch Fertilizer, LLC (together, the "Koch Defendants"); Yara International ASA and Yara North America, Inc. (together, the "Yara Defendants"); Cantopex Ltd.; International Fertilizer Association ("IFA"); and The Fertilizer Institute ("TFI") conspired to unreasonably restrain trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, by artificially reducing or eliminating competition and raising or fixing prices with respect to the production, sale, marketing, and distribution of nitrogen (N), phosphorus (P), and potassium (K) fertilizer  ("NPK Fertilizer") sold in the United States. The Complaint further alleges that Defendants' unlawful conduct substantially lessened competition in the market for NPK Fertilizer in the United States in violation of Section 7 of the Clayton Act, 15 U.S.C. § 18.

To date, four other cases have been filed across the United States raising substantially similar allegations. Three other direct purchasers of NPK Fertlizer have filed class action complaints raising similar allegations in the Northern District of Illinois and the District of Colorado. Further, indirect purchasers of NPK Fertilizer filed an additional class action complaint alleging the same conduct in the District of Kansas.

Transfer and centralization of these actions to the Western District of Missouri will advance the efficient resolution of this litigation and serve the convenience of the parties and witnesses. The Western District of Missouri is the most convenient location for the parties and witnesses given the conspiracy's national scop—directly tied to farmlands largely concentrated in the Midwest—and has the requisite resources to effectively manage this multidistrict litigation.

**FACTUAL AND PROCEDURAL BACKGROUND**

This litigation arises from a years-long scheme through which Defendants consolidated the NPK Fertilizer industry and colluded to raise prices for NPK Fertilizer nationwide. *See IIHAB P'ship v. Nutrien Ltd., et al.*, No. 4:26-cv-00221 (W.D. Mo. Mar. 16, 2026), Compl. ¶¶ 2–3. What was once a competitive market composed of numerous independent manufacturers has, through a series of private equity roll-ups and acquisitions, transformed into a highly concentrated industry controlled by a cartel of manufacturers comprised of  the Nutrien Defendants, the Mosaic Defendants, CF Industries Holdings, Inc., the Koch Defendants, the Yara Defendants, and Cantopex Ltd. (together, the "Manufacturer Defendants"). *Id.* ¶ 1.

In the late 1970s and early 1980s, there were fifty-six major nitrogen companies, twenty-five companies that mined phosphate rock, and fifteen major potash companies operating in the United States and Canada. *Id.* ¶ 71. Today, market power is consolidated in only a handful of NPK Fertilizer manufacturers. *Id.* ¶¶ 72–76. The Manufacturer Defendants loom over the NPK Fertilizer

market where, together, they control 82% of the nitrogen market, over 90% of the potash market, and 91% of the phosphate market. *Id.* ¶ 73.

As the Manufacturer Defendants increased their market power and reduced competition, they ultimately chose to cooperate with one another rather than compete against each other. *Id.* ¶¶ 77–79. Through exclusive trade organizations run by Defendants TFI and IFA, Defendants conspired to exchange confidential and competitively sensitive information, which enabled them to align output decisions and maintain supracompetitive pricing. *Id.* ¶¶ 116–41. For example, Defendants exchange trade data through various platforms, including TFI's Fertilizer Reporting Solutions platform that, as TFI has explained, is an area of the industry "where we don't need to compete." *Id.* ¶ 140.

The results of the conspiracy have been significant and nationwide. NPK Fertilizer prices have been rising since at least 2020 and remain at an elevated rate far exceeding inflation and any legitimate cost-based explanation. *Id.* ¶¶ 83–88, 102–03. Ordinary market principles cannot explain the extreme profit margins the Manufacturer Defendants benefit from. Although the cost of goods sold increased by only 58% following 2020, the Manufacturing Defendants' profits soared. *Id.* ¶ 83. As U.S. farmers have experienced a decrease in their net farm income by nearly 30%—from $182 billion in 2022 to $127.5 billion in 2024—the Manufacturer Defendants' corporate profits increased nearly 300% and NPK Fertilizer prices doubled. *Id.* ¶ 100. These artificial price increases and the deliberate collusion among Defendants have caused strain on farmers across the country, impairing their ability to sustain their businesses and production.

As of present, three other direct purchaser plaintiffs have filed similar claims—in the Northern District of Illinois and District of Colorado. *See Stevens v. Nutrien Ag Solutions, et al.*, No. 1:26-cv-02585 (N.D. Ill. Mar. 7, 2026); *Union Line Farms, Inc. v. Mosaic Co., et al.*, No.

1:26-cv-01043 (D. Co. Mar. 13, 2026); *Rumbold v. Nutrien Ag Solutions, et al.*, No. 1:26-cv-03051 (N.D. Ill. Mar. 18, 2026). One indirect purchaser plaintiff has also filed a class action complaint alleging similar conduct in the District of Kansas. *See Matson v. Koch Fertilizer, LLC, et al.*, No. 2:26-cv-02146 (D. Ka. Mar. 16, 2026). Movant filed its direct-purchaser case in the Western District of Missouri. *See IIHAB P'ship v. Nutrien Ltd., et al.*, No. 4:26-cv-00221 (W.D. Mo. Mar. 16, 2026). All of these Related Actions are at the same early procedural posture, as Defendants have not yet responded or moved to dismiss in any of the cases.

## ARGUMENT

### I.    Transfer and Centralization Fulfills the Goals of Section 1407.

"When civil actions involving one or more common questions of fact are pending in different districts," this Panel may transfer such actions "to any district for coordinated or consolidated pretrial proceedings," if transfer will serve "the convenience of parties and witnesses and will promote the just and efficient conduct of such actions." 28 U.S.C. § 1407(a). Coordination under Section 1407 "eliminate[s] the potential for conflicting contemporaneous pretrial rulings by coordinate district and appellate courts in multidistrict related civil actions." *In re Plumbing Fixture Cases*, 298 F. Supp. 484, 491–92 (J.P.M.L. 1968). Because these requirements are met here, the Panel should transfer the Related Actions to the Western District of Missouri for coordinated or consolidated pretrial proceedings.

### A.    *The Related Actions involve common questions of fact.*

For purposes of Section 1407, common factual questions exist where multiple actions assert similar "core factual allegations" and "can be expected to focus on a significant number of common events, defendants, and/or witnesses." *In re Unumprovident Corp. Sec., Derivative & "ERISA" Litig.*, 280 F. Supp. 2d 1377, 1379 (J.P.M.L. 2003). Section 1407 "does not require a complete identity or even majority of common factual issues as a prerequisite to transfer" but

rather only requires that the actions share one or more factual issues. *In re Ins. Brokerage Antitrust Litig.*, 360 F. Supp. 2d 1371, 1372 (J.P.M.L. 2005).

Notably, the Panel routinely finds centralization appropriate for antitrust cases. *See, e.g.*, *In re Qualcomm Antitrust Litig.*, 273 F. Supp. 3d 1373, 1375 (J.P.M.L. 2017) (finding consolidation appropriate where cases "assert similar claims for violations of federal and state antitrust and consumer protection laws"); *In re Visa/Mastercard Antitrust Litig.*, 295 F. Supp. 2d 1379, 1380 (J.P.M.L. 2003) (same); *In re Polyester Staple Antitrust Litig.*, 259 F. Supp. 2d 1376, 1377-78 (J.P.M.L. 2003) (same); *In re Parcel Tanker Shipping Servs. Antitrust Litig.*, 296 F. Supp. 2d 1370, 1371 (J.P.M.L. 2003) (same).

Here, transfer, coordination, and centralization is appropriate because the Related Actions involve nearly identical factual backgrounds, substantially similar antitrust allegations against the Defendants,[1] and common questions, including:

- Whether Defendants and their co-conspirators combined or conspired with one another to not compete in the U.S. market for NPK Fertilizer;

- Whether Defendants and their co-conspirators combined or conspired with one another to fix, raise, maintain, or stabilize prices for NPK Fertilizer sold to purchasers in the United States;

- Whether Defendants and their co-conspirators participated in meetings and trade association conversations among themselves in the United States and elsewhere to implement, adhere to, and police the unlawful agreements that they reached; and

- Whether Defendants' and their co-conspirators' conduct caused the prices of NPK Fertilizer sold to purchasers in the United States to be artificially fixed, raised, maintained, or stabilized at supracompetitive prices.

---

[1] Each Related Action names at least one member, whether parent company or subsidiary, of each of the Manufacturer Defendants named by Movant. While Movant's action additionally names TFI and IFA as Defendants, all complaints name and describe the actions of TFI as part of the antitrust behavior.

**B.**     ***Coordination and consolidation will serve the convenience of the parties and witnesses and will promote the just and efficient conduct of the Related Actions.***

Because the Related Actions' factual allegations and legal claims overlap, transfer would serve "the convenience of parties and witnesses and . . . promote the just and efficient conduct" of such actions. 28 U.S.C. § 1407(a). Several actions are already pending across four districts and additional cases will likely be filed. Centralizing these cases now—while all actions remain at an early pretrial stage—will allow the parties to immediately capture the efficiencies of centralization and coordination. *See In re Lowe's Companies, Inc., Fair Lab. Standards Act & Wage & Hour Litig.,* 481 F. Supp. 3d 1332, 1333-34 (J.P.M.L. 2020) (granting transfer pursuant to Section 1407 where the litigation was "at a relatively early stage of pretrial proceedings"); *In re: Edward H. Okun I.R.S. |1031 Tax Deferred Exch. Litig.*, 609 F. Supp. 2d 1380, 1381 (J.P.M.L. 2009) ("[D]enial of either of Wachovia's transfer motions could engender delay, as the Panel may be asked to revisit the question of Section 1407 centralization. Centralizing these actions now under Section 1407 should streamline resolution of this litigation to the overall benefit of the parties and the judiciary."); *In re: AndroGel Prod. Liab. Litig.*, 24 F. Supp. 3d 1378, 1379 (J.P.M.L. 2014) (rejecting alternatives to centralization because they "would delay the resolution of the common core issues in this litigation").

As the Related Actions have common factual and legal questions, they will also have many overlapping pretrial issues, including the adequacy of the claims and allegations. Centralization will ensure consistent rulings on these issues. *See In re: Zimmer Durom Hip Cup Prods. Liab. Litig.*, 717 F. Supp. 2d 1376, 1377 (J.P.M.L. 2010) (finding centralization appropriate where it would "prevent inconsistent pretrial rulings on discovery and other issues"). Centralizing pretrial proceedings for the Related Actions—and any subsequent tagalong actions—will provide current and future plaintiffs with a single, organized, and easily accessible forum for adjudication.

Centralization is also appropriate because the Plaintiffs will undoubtedly pursue substantially similar testimony, documents, and other evidence from the Defendants and their co-conspirators. Specifically, the Plaintiffs will need to seek documents and deposition testimony related to Defendants' roll-up strategy and acquisition plans in the NPK Fertilizer market, Defendants' pricing and output decisions, communications and data exchanges among the Manufacturer Defendants through TFI and similar organizations, and the effects of Defendants' conduct on U.S. farmers, among other topics. Coordinated discovery will eliminate duplication and avoid subjecting common witnesses to repeated demands.

With the Related Actions proceeding in two separate districts in different states with distinct Plaintiffs' counsel, centralizing the Related Actions will have "the salutary effect of placing all actions in this docket before a single judge who can formulate a pretrial program that ensures that pretrial proceedings will be conducted in a manner leading to the just and expeditious resolution of all actions to the overall benefit of the parties." *In re Cook Med., Inc., Pelvic Repair Sys. Prods. Liab. Litig.*, 949 F. Supp. 2d 1373, 1375 (J.P.M.L. 2013); *see also In re Chantix (Varenicline) Mktg., Sales Pracs. & Prods. Liab. Litig. (No. II),* No. MDL 3050, 2022 WL 17843104, at *1 (J.P.M.L. Dec. 22, 2022) (granting transfer and finding centralization would "eliminate duplicative discovery; prevent inconsistent pretrial rulings . . . ; and conserve the resources of the parties, their counsel, and the judiciary"); *In re Auto Body Shop Antitrust Litig.*, 37 F. Supp. 3d 1388, 1390 (J.P.M.L. 2014) (finding transfer to a single judge appropriate to ensure "common witnesses are not subjected to duplicative discovery demands"). Without transfer under Section 1407, duplication of efforts is inevitable.

For the foregoing reasons, the Panel should centralize the Related Actions.

**II.     The Panel Should Transfer the Related Actions to the Western District of Missouri.**

In determining the appropriate transferee district, the Panel considers a variety of factors, including whether the district "offers a forum that is both convenient and accessible for the parties and witnesses" and the experience of the transferee judge and district in navigating "the nuances of complex and multidistrict litigation." *See In re: Aggrenox Antitrust Litig.*, 11 F. Supp. 3d 1342, 1343 (J.P.M.L. 2014). These factors support transfer to the Western District of Missouri.

### *A.     The Western District of Missouri is convenient and accessible.*

Because this litigation involves an alleged nationwide conspiracy, the Panel should select a district that is "geographically central and accessible." *In re: DePuy Orthopaedics, Inc., Pinnacle Hip Implant Prods. Liab. Litig.*, 787 F. Supp. 2d 1358, 1360 (J.P.M.L. 2011). There is none better than the Western District of Missouri. The geographically convenient location of Kansas City is ideal given the broad dispersion of the parties and putative class members. Plaintiffs reside across the farmlands of the United States, covering a geographical range that spans from coast to coast but is heavily concentrated down the Wheat Belt of the Midwestern United States—from North Dakota to Texas. Missouri is conveniently located in the heart of the country and center of the affected areas, affording Plaintiffs and Defendants a convenient, central location.

The Western District of Missouri affords out-of-town parties and counsel easy and convenient access to Kansas City International Airport, which is located less than a half an hour drive away from the Western District of Missouri courthouse in Kansas City and offers direct flights to nearly 50 U.S. cities.[2] Moreover, Kansas City is well positioned to receive rural plaintiffs, spanning over the two key states of Missouri and Kansas and connected to the top farmland producing states by interstates such as the east-to-west I-70 and the north-to-south I-35. There is

---

[2] https://flykc.com/nonstop-destinations

also a large selection of hotels and other accommodations in Kansas City metropolitan area,[3] with more than 14,000 hotel rooms in the area.[4]

Kansas City is an epicenter of the agricultural issues at play in this lawsuit. Missouri ranks in the top five states with the highest number of farms in the country. In 2022, Missouri had the second highest number of farms in the country, behind Texas.[5] Missouri had the third highest number of farms in the country in 2024, behind only Texas and Iowa.[6] Missouri crop production totaled 803 million bushels, comprised of crops such as corn, soybean, rice and wheat.[7] Missouri's crops fuel a diverse output of uses such as food, biofuel production, and livestock feed.[8]

Missouri serves as a nexus of the states whose citizens have been most impacted by the NPK Fertilizer conspiracy. The majority of the top ten states by number of farms share a boarder with Missouri including Iowa, Illinois, Oklahoma, Kentucky, Tennessee.[9] Missouri's remaining neighboring states, Kansas and Arkansas, are also home to many of the country's farmland.[10] Missouri is well-positioned in the heart of the states that comprise the bulk of U.S. farmers, which form the plaintiffs of this litigation. Missouri's key location to the issues and impacted farmers makes it convenient and accessible. As discussed below, the Western District of Missouri is also conveniently located for the Defendants who regularly transact business across the Midwest.

---

[3] The "Kansas City metropolitan area" spans urban development in both Kansas City, Missouri and the neighboring Kansas City, Kansas.

[4] https://www.bizjournals.com/kansascity/subscriber-only/2025/12/19/kansas-citys-largest-hotels.html

[5] https://www.nass.usda.gov/Publications/Highlights/2024/Census22_HL_FarmsFarmland.pdf

[6] https://worldpopulationreview.com/state-rankings/farm-count-by-state

[7] https://raff.missouri.edu/wp-content/uploads/2024/11/Missouri-Agriculture-Outlook-Report-2024.pdf

[8] *Id.*

[9] *Supra*, note 5.

[10] *Supra*, note 6.

### B.    The Western District of Missouri has the resources and judicial expertise to effectively handle this litigation.

In addition to being conveniently located, the Western District of Missouri also has the resources and judicial experience to properly conduct these complex proceedings. With seven active Article III judges and a dramatically shorter time to disposition in civil cases than many other jurisdictions,[11] the Western District of Missouri is well positioned to effectively and efficiently handle this litigation. Specifically, the median time to disposition in civil cases in the Western District of Missouri is 7.0 months, whereas the national median is 23.9 months.[12]

While two other Related Actions are pending in the Northern District of Illinois, the Panel has recognized that the location of currently filed cases is not a critical factor in the Panel's decision to transfer and centralize litigation where, as here, potential plaintiffs and putative class members "will reside in every corner of the country." *In re: BP p.l.c. Sec. Litig.*, 734 F. Supp. 2d 1376, 1377-79 (J.P.M.L. 2010); *see also In re: Darvocet, Darvon & Propoxyphene Prods. Liab. Litig.*, 780 F. Supp. 2d at 1381 (J.P.M.L. 2011) (concluding that "the location of the currently filed cases is not a particularly significant factor in [the Panel's] decision" because "potential plaintiffs and putative class members will reside in every corner of the country and defendants are located in several states"). Further, the vast majority of the Defendants are not located in Illinois, and several of the Manufacturer Defendants maintain manufacturing facilities across the United States, including one in Missouri, as well as two in Missouri's neighboring states of Kansas and Iowa, and also in Florida, Colorado, and Minnesota. To the extent that evidence concerning parts of the conspiracy is located outside of the Western District of Missouri, that evidence would be dispersed throughout multiple federal judicial districts across the country. Thus, the Western District of

---

[11] https://www.uscourts.gov/data-news/data-tables/2025/03/31/federal-judicial-caseload-statistics/c-5

[12] *Id.; see also*

Missouri, being centrally and conveniently located, is the best forum for the relevant witnesses and evidence.

Accordingly, the Western District of Missouri is an ideal transferee forum and is well equipped to guide this litigation effectively.

## CONCLUSION

For the foregoing reasons, the Movant respectfully requests that the Panel transfer and promptly centralize the Related Actions, as well as any cases that may be subsequently filed asserting related or similar claims, to the Western District of Missouri.

Dated: March 19, 2026

Respectfully submitted,

By: */s/ Benjamin J. Widlanski*
Benjamin J. Widlanski (Fla. 1010644)
Brandon M. Sadowsky (Fla. 1052643)
Lindsey E. Graham (Fla. 1069593)
**KOZYAK TROPIN THROCKMORTON LLP**
2525 Ponce de Leon Boulevard, 9th Floor
Coral Gables, Florida 33134
Tel: (305) 372-1800
Fax: (305) 372-3508
bwidlanski@kttlaw.com
bsadowsky@kttlaw.com
lgraham@kttlaw.com

Bryan T. White (Mo. 55805)
Gene P. Graham, Jr. (Mo. 34950)
**WHITE, GRAHAM, BUCKLEY, & CARR, LLC**
19049 East Valley View Parkway, Ste. C
Independence, Missouri 64055
Tel: (816) 373-9080
Fax: (816) 373-9319
ggraham@wagblaw.com

bwhite@wagblaw.com

Joseph R. Saveri (Cal. 130064)
Diane S. Rice (Cal. 118303)
Cadio Zirpoli (Cal. 179108)
**SAVERI LAW FIRM, LLP**
550 California Street, Suite 910
San Francisco, California 94104
Telephone: (415) 500-6800
Facsimile: (415) 395-9940
jsaveri@saverilawfirm.com
czirpoli@saverilawfirm.com

Clayton A. Jones (Mo. 51802)
**CLAYTON JONES, ATTORNEY AT LAW**
P.O. Box 257 405 W. 58 Hwy.
Raymore, Missouri 64083
Tel: (816) 318-4266
Fax: (816) 318-4267
clayton@claytonjoneslaw.com

*Attorneys for Movant*